## TELLINGTON v. GREAT SOUTHERN TRUCKING CO., et al.

Industrial Commission.

December 17, 1954.

Charles F. Chastain, Oxford & Oxford, Lakeland, and A. Z. Adkins, Jr., Gainesville, for claimant.

Marks, Gray, Yates & Conroy, Jacksonville, for the employer and insurance carrier.

JAMES T. VOCELLE, Chairman and WALTER L. LIGHTSEY, Commissioner.

This cause came on to be heard upon application for review of a deputy commissioner's order dated May 31, 1954. This is a claim for death benefits by the widow of J. W. Tellington against two alleged employers of her late husband. Each of the alleged employers, Great Southern Trucking Co. and L. B. Wingate, controverted the claim—each contending that the deceased was an employee of the other. The question before us is one of law, there being no controversy as to the facts, which are substantially as stated by the deputy—

Great Southern Trucking Co. is a corporation licensed by the Interstate Commerce Commission and the Florida Railroad and Public Utilities Commission as a common carrier of motor freight for hire. Its entire operation is governed by the regulations of these two bodies. It owns outright 75% of all its tractors and trailers and, as authorized by the Interstate Commerce Commission, leases approximately 25% of the tractors and trailers used in its operation. It carries on its payroll as regular employees the drivers who operate its own equipment and who receive certain benefits such as vacations with pay, selected runs, etc. These "regular" drivers, of course, are paid directly by Great Southern, which maintains the usual social security and withholding records for them. It also utilizes the services of *leased drivers* who are furnished by the owners of the leased tractor. . . . . . There is practically no difference between the duties, responsibilities and method of operation of the regular drivers and those of the leased drivers. Nor is there any difference in the method or extent of control exercised by Great Southern over these two types of drivers. Each is required by I.C.C. and Great Southern to have a very thorough physical examination, which is paid for by Great Southern. Both types of drivers are examined and tested by Great Southern's driver-trainer before either is allowed to make a run for the common carrier. Both are dispatched by employees of Great Southern . . . . The regular drivers and leased drivers carry the same type of bills of lading and manifests issued by Great Southern. On occasion both types of drivers assist in loading or unloading freight and carry mail for the corporation . . . . Great Southern maintains personnel files on all drivers, both regular and leased, but does not maintain any social security or tax withholding records in respect to leased drivers . . . . The leased drivers as well as the regular drivers were called or informed by Great Southern when they would make their runs and the deceased, Tellington, drove Wingate's equipment for Great Southern exclusively. The tractor involved in the fatal accident was painted similarly to the other equipment owned by Great Southern and bore its name prominently displayed on it.

The lease agreement between Wingate and Great Southern under which Tellington was operating at the time of his death provided, among other things—

A. Lessor shall bear all costs incident to registering, licensing, operating and maintaining the tractor equipment, including the

driver's wages, and fuel, and further, Lessor covenants that the tractor equipment herein leased complies with all safety regulations and is equipped with all safety equipment prescribed by the Interstate Commerce Commission and the various commissions of the states traversed on said trips. Lessor further agrees that Lessee will not be held responsible for any damage to, loss or destruction of said tractor equipment and Lessor agrees to hold Lessee harmless for any damage to, loss or destruction of said tractor equipment. Lessor hereby covenants that the said tractor equipment is provided with collision, fire and theft insurance and Lessor agrees to exhibit evidence to Lessee of such insurance.

The tractor equipment shall be operated by a qualified driver (or drivers) acceptable to Lessee, said driver (or drivers) to be employed, hired, paid and discharged by Lessor only, provided, however, that the Lessor shall require each such driver to furnish Lessee with a completed Form No. 311, Supplemental Driver Information, and a completed Driver's Physical Examination, Form No. 341, prior to operation of the tractor equipment by said driver.

B. Lessee shall have exclusive possession, control and use of the tractor equipment and Lessee assumes complete responsibility and liability to the shipper, the consignees, and the public, and responsibility to the Interstate Commerce Commission and state commissions for compliance with their rules and regulations for the operation of the tractor equipment, and Lessee shall insure the leased tractor equipment for public liability and property damage, and provide cargo insurance, all such liability to be the liability of the Lessee for the duration of the Lease. (Such protection of the public, however, not to affect the covenants of Lessor herein, as between Lessor and Lessee.)

The fatal accident occurred on a trip the deceased was making while driving Wingate's tractor which was pulling a trailer belonging to Great Southern on the route from Lakeland to Jacksonville. The deputy commissioner ordered Great Southern to pay compensation, holding that Tellington was a special employee of that company, loaned to it by Wingate and that he was under the exclusive control of Great Southern at the time he met his death.

The majority of the commission is in accord with the conclusions of the deputy commissioner. Tellington owed sets of duties to both Wingate and Great Southern. However, the record shows that the duties which the deceased was performing while driving on the highway were duties owed to Great Southern by virtue of the lease arrangement. While performing these functions for Great Southern, he was an employee of Great Southern under the doctrine of loaned employee and implied contract. We quote with approval the following from the deputy's order—

In Berrier v. Associated Indemnity Company, 196 So. 188, the Supreme Court of Florida set up the yardstick for determining whether the relationship of employer and employee exists with a special employer to whom an employee is loaned. These are—

(a) Assent on the part of an employee to work for a special employer.

It is reasonably inferable from the testimony presented that Tellington had consented to work for Great Southern . . . .

(b) Actual entry by the employee upon the work of and for the special employer pursuant to an express or implied contract so to do.

The same facts set forth under (a) supra, establish an implied contract between Great Southern and Tellington under which he operated the tractor it had leased from Wingate.

Affirmed. It is ordered that the employer by an through its carrier pay to claimant's attorney the sum of $275, which is a reasonable fee for representing the claimant in this cause before the full commission.

JAMES CAMERON, Commissioner (dissenting).

I cannot agree with the majority that this is a "loaned employee" case. "Loaned employee" is precisely what the phrase implies. Original employer permits his employee to be relieved of his prime employment duties and to enter upon the service of another, the so-called "special employer." It is to be noted in the decisions based on the "loaned employee" principle that there has been a *suspension* of the functions of the original employer-employee relationship.

In the present case, Wingate is in the business of furnishing a tractor. He employs a driver who has specific duties in furthering his business and in performing the very functions of that business. The driver is Wingate's instrumentality for performing what is required to be done under the lease arrangement. In addition to driving, he must see to it, on behalf of his employer, that the tractor is so maintained that it may effectively haul the trailer. He must purchase gas and oil, see to it that the tires are in proper condition, repair whenever necessary and within his ability during the course of a trip and any number of other details—all in furtherance of what Wingate is obliged to do under his contract with Great Southern. In addition, Wingate is depending on his driver to do all that is necessary to maintain and to protect a valuable, in fact the only, asset of Wingate's business.

It is said that the driver is under the control of Great Southern while on a trip. As a practical matter, neither Wingate nor Great

Southern is present during the course of a trip. It is true that Great Southern initially instructs the driver where to go and can likewise change or modify its instructions regarding destinations of deliveries during the course of a trip. But it is equally true that Wingate has the power, during a trip to direct and control the driver concerning many phases of the driver's activity—speed, various mechanics of the actual physical driving, the truck's care and maintenance. In fact, under the terms of the contract, it is Wingate who has the sole power to fire him.

When the driver is on the road, he is doing a job for Great Southern and he is doing a job for Wingate. This is a good example of the "joint employment" cases and under the principle of "joint employment," the loss would be equally borne by Wingate and Great Southern.